**Affirmed and Memorandum Opinion filed May 24, 2012.**



**In The**

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

————————————

**NO. 14-10-00929-CR**

————————————

**LUCAS RURIC COE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 232nd District Court
Harris County, Texas
Trial Court Cause No. 1227878**

## MEMORANDUM OPINION

Appellant, Lucas Ruric Coe, was found guilty by a jury of aggravated sexual assault of a child under six years of age. *See* Tex. Penal Code Ann. § 22.021 (West 2011). The jury assessed appellant's punishment at life in the Institutional Division of the Texas Department of Criminal Justice and imposed a fine of $10,000.[1] *See* Tex. Penal Code Ann. §§ 12.32(a), (b), 22.021(f) (West 2011). In four issues, Appellant challenges (1) the sufficiency of the evidence to sustain his conviction; (2) the admissibility of photographs depicting injuries of the complainant; (3) the trial court's

---

[1] Pursuant to section 508.145(a) of the Texas Government Code, appellant's life sentence was to be served without the possibility of parole. *See* Tex. Gov't Code Ann. § 508.145(a) (West Supp. 2011).

alleged error in failing to issue a ruling on the admissibility of impeachment evidence; and (4) the in-court identification of appellant's co-defendant.   We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly before 10:00 o'clock in the evening of June 27, 2009, Cypress Creek EMS notified Memorial Hermann Woodlands Hospital that they were bringing a four year old with CPR in progress to the emergency room.   The ambulance arrived at 10:02 p.m. and the paramedics wheeled Emma Thompson in through the ambulance entrance.   Emma was in full arrest, which means she had stopped breathing and the paramedics were assisting with chest compressions.   Janet Contreras was the primary nurse involved in Emma's care.   Contreras testified that after observing Emma's bright red hair, the next thing she noticed was Emma's injuries.   Contreras testified that Emma "was bruised from head to toe."   According to Contreras, Emma's abdomen was "very distended and just bruised like you wouldn't believe, just bruised everywhere."   Emma's attending physician, Dr. Kevin Catney, pronounced Emma dead at 10:05 p.m., only three minutes after her arrival at the hospital.

After Dr. Catney declared Emma dead, Contreras was required to document Emma's injuries.   Contreras testified about the injuries she observed during this process. During her testimony about Emma's injuries, Contreras referred to photographs taken by Deputy Mark McElvany, a crime scene investigator with the Harris County Sheriff's Department, who arrived at the hospital approximately one hour after Emma had been declared dead.[2]   In addition, the Memorial Hermann Woodlands Hospital records

---

[2] These photographs, State's Exhibits 2 through 18 and 20 were admitted over appellant's relevance objection.   Appellant did not object to Contreras's testimony detailing her observations of Emma's numerous visible injuries.

2

detailing Contreras's observations were admitted into evidence without objection by appellant.[3]

Contreras observed that Emma had bruising on her face and an injured lip. Contreras could not say whether the injury to Emma's mouth was an old or fresh injury. She also testified that some of the facial bruises near Emma's chin were new and could have been caused by the cervical collar that had been placed on her. Emma also had a laceration on the back of her head that Contreras reported had been super glued by her mother, Abigail Young. Even though the laceration was no longer bleeding, there was bright red blood present which indicated the wound was fresh. According to Contreras she could not tell the severity of the cut because it had been super glued.[4] As a result of her examination of Emma, Contreras believed her hair had been recently washed and Emma looked like she had been freshly bathed.

Contreras observed that lividity had already set in and as a result, she believed Emma had been dead for some time when she arrived at the hospital.[5] Emma's abdomen was very distended and had bruising, which suggested internal injuries allowing body fluids to escape into her abdomen. Contreras observed a new abrasion on Emma's back.

Contreras also saw new bruising to Emma's inner thighs. She also noticed a partial tear to Emma's vagina and testified it did not look like a normal vagina on a four year old child. Contreras based her opinion on her observations that Emma's vagina

---

[3] The Memorial Hermann Woodlands Hospital records were admitted as State's Exhibit 244 and appellant affirmatively stated he had no objection to their admission.

[4] According to Contreras Dermabond is sometimes used to close wounds, but it is not the same thing as super glue.

[5] According to Contreras, when someone dies, that person's blood stops flowing and gravity pulls the blood down to the lowest parts of the body. Contreras testified an observer can see these signs of lividity.

was red and irritated around the edges and the opening was larger than should be present in a four year old child's vagina. Contreras testified she believed the injury to Emma's vagina was a recent injury because she observed bright red blood that was oozing from the wound. Contreras testified that, based on her experience, the tear to Emma's vagina could not have been an accidental injury. According to Contreras, while a straddle type injury can cause a vaginal tear, she did not believe the tear she observed in Emma's vagina was the result of a straddle injury. Contreras explained that straddle injuries are generally minor and normally do not need stitches to heal. Contreras based her opinion that Emma's vaginal injury was not a straddle injury on the large size of the tear, which extended almost to Emma's rectum.

Carolyn Swann was the charge nurse at Memorial Hermann Woodlands Hospital the evening of June 27, 2009. When Swann first saw Emma she appeared lifeless. Swann also observed bruising on Emma's body and noticed her abdomen was distended. Swann assisted Nurse Contreras in her post-mortem documentation of Emma's injuries. Swann testified that she observed fresh blood in Emma's vaginal area and that her underwear was bloody. She also saw the tear in Emma's vagina.

On cross-examination, appellant questioned Swann about CPR. Swann agreed that CPR can be a violent procedure and the person receiving CPR can occasionally suffer injuries such as bruises and fractured ribs as a result of the process.

Young and Ben Thompson, Emma's father, had separated in April of 2009. In the months prior to Emma's death, appellant had begun a romantic relationship with Young and he began staying overnight at Young's home on a regular basis. In addition, Young would leave Emma at home alone with appellant as her babysitter. Prior to May 17, 2009, Emma typically attended day care at the South Montgomery County YMCA when Young was working. However, after May 17, 2009 Emma almost completely stopped going to the YMCA. Between May 17 and her death on June 27, 2009, Emma

4

attended the YMCA on only two occasions.   Appellant would babysit Emma when she did not go to the YMCA and Young worked.

Appellant's sister, Nicole Walker, was friends with Young's neighbor, Christie Frazier.   Walker met Young as a result of her friendship with Frazier.   Walker noticed that Emma began having medical problems in the month prior to her death.   According to Walker, Emma was vomiting and had begun "pottying" in her pants again.   Walker testified that she and Young "got cross-wise" because of Emma's vomiting.   Walker told Young that Emma could not come to her house until Young had taken Emma to the doctor about the vomiting.   According to Walker, Young and appellant were romantically involved by that point in time.

On the weekend of June 5, 2009, Emma and her two sisters, J.T. and L.D., went to stay with Emma's father.   Thompson immediately noticed that Emma had bruises on her nose, around her eye, on her stomach, what appeared to be a laceration on her lip, and what looked like rug burn on her back.   Thompson found this unusual and asked Emma how she got all those injuries.   Emma responded that she had fallen out of bed and explained "I clubby, dad.   I sorry."   Thompson also confronted Young about the injuries.   On June 6, Thompson heard Emma whimper when she went to the bathroom and on June 7, he heard her scream while using the bathroom.

On June 8, 2009, Young took Emma to see her regular pediatrician, Dr. Poonam Singh.   Dr. Singh's medical records were admitted into evidence without objection from appellant.   Emma arrived at Dr. Singh's office with bruising, complaints of burning urination, discharge after urination, and that she easily bruised.   Emma also had a high fever of 102.3.   Young explained the bruises by telling Dr. Singh that Emma had run into some iron furniture a few months back and had fallen off the bed about ten days before the appointment.

5

When she examined Emma, Dr. Singh noticed a large number of bruises, including a large bruise with an underlying knot on her left cheek extending to her nose, forehead, and upper lip. Dr. Singh also saw two thumb or finger marks on Emma's rib cage and a bruise on her belly, which she considered unusual. Dr. Singh also found bruises on Emma's legs, but she did not consider those unusual in a child. Young explained the thumb marks occurred when she picked Emma up. Dr. Singh, in Young's presence, asked Emma if someone was hurting her and Emma responded, "Luke holds me tight." Dr. Singh then asked Young about "Luke." Young did not tell Dr. Singh that she was romantically involved with appellant. Instead, she told Dr. Singh that he was a family friend who was a handyman helping in the garage. Because of the unusual bruises, Dr. Singh had Emma undergo a chest x-ray. The x-ray was normal, revealing no healing or current fractures. Dr. Singh also ordered blood tests, which revealed no medical explanation for Emma's bruising. As a result of the unexplained bruises, Dr. Singh made a referral to CPS that same evening.

During her exam, Dr. Singh observed ulcers on the roof of Emma's mouth and on her fingers. When Dr. Singh examined Emma's genital area, she found no tears or bleeding, but she did discover ulcers or lesions. Dr. Singh advised Young to use barrier cream on Emma to reduce the burning that Emma was experiencing when urinating. Believing these ulcers or lesions were some type of herpes-like illness, Dr. Singh obtained a vaginal swab for a viral culture. The results of the vaginal swab came back on June 12, 2009. The test revealed that Emma was infected with Herpes Simplex Type II ("herpes 2"). Knowing that herpes 2 is generally a sexually transmitted disease, Dr. Singh referred Emma for a full sex abuse clinic exam. To Dr. Singh's knowledge, no one else in Emma's family had contracted herpes 2 at that point in time and she had never had any issues of sexual or physical abuse with Emma or her sisters. During appellant's trial, Dr. Singh testified that, "[t]here was no doubt in my mind that the child was being

6

sexually and physically abused at this point." Dr. Singh notified CPS and Young of the test results and the fact that Emma needed a full sex abuse exam.

Appellant later tested positive for herpes 2. Based on the test results, there was no way to tell when appellant contracted the virus, other than it was sometime before February 26, 2010, the date of the test. Thompson tested negative for the disease, indicating that he did not have it. Young also tested positive for herpes 2. Dr. Singh acknowledged it was possible Emma could have gotten herpes from her mother, but she refused to say it was a probability.

Appellant called Dr. Mark Schleiss to testify as an expert witness. Dr. Schleiss is a pediatrician with a specialty in infectious diseases. Dr. Schleiss opined that herpes 2 can be spread through nonsexual means and that, hypothetically, a mother could spread the virus by administering a cream or lotion to the vaginal area of a child. On cross-examination, Dr. Schleiss agreed that herpes 2 is most commonly associated with sexual transmission and that it is less common for young children to have herpes 2. Dr. Schleiss also admitted that if a doctor finds a child under age five with herpes 2 in the genital area, it is a red flag and the doctor should be concerned. Dr. Schleiss testified that if a mother brought in a child with herpes 2 in her genital area he would want to have a comprehensive evaluation done for possible child abuse. Dr. Schleiss admitted that if the parent then lied during that comprehensive examination about who is present in the house with the child, "it makes the whole process much more difficult to evaluate." Finally, Dr. Schleiss agreed that appellant's babysitting of Emma occurred within the incubation period for primary herpetic infection.

On the weekend of June 11, 2009, Amanda Matthews, Young's sister, came over to visit and to take Young's children on a trip to NASA along with her own daughter. Matthews was unable to take Emma on the trip because she was not feeling well. Matthews thought Emma's whole demeanor had changed from the spring; Emma no

7

longer acted like herself. Emma had normally been a happy-go-lucky child and very talkative, but now she did not interact with everyone and appeared standoffish. Emma repeatedly asked when her father was coming home. Emma also asked her aunt repeatedly if she would still be there in the morning and when she would be leaving. On the evening of June 14, Matthews tucked Emma into bed and Emma asked Matthews a question.[6] In response to that question, Matthews shut Emma's bedroom door that night. Emma did not normally sleep with her bedroom door shut.

On June 17, 2009, Young took Emma to be examined at Texas Children's Hospital. The examination revealed no indication of trauma at that time, and the social worker noted that herpes 2 is not necessarily indicative of sexual abuse. Dr. Kelly DeScioli, the examining physician, agreed there was no damage to Emma's hymen area, indicating no penetration on that day. While Dr. DeScioli agreed that herpes 2 can be transmitted in a nonsexual manner, she explained that it is only rarely transmitted in a nonsexual way because it is commonly a sexually transmitted disease. Though Emma did not make an outcry to Dr. DeScioli, and she denied that anyone had touched her inappropriately, Dr. DeScioli only spoke to Emma in front of her mother. During Dr. DeScioli's examination, Young told Dr. DeScioli that she had no concerns about sexual abuse. Young did not tell Dr. DeScioli that she had a new boyfriend who was babysitting Emma.

On the afternoon of June 26, 2009, appellant was staying with his sister Nicole Walker and her family. Nicole's husband, Shawn Walker, who was home working in the utility room of their house, heard appellant call Young. Appellant asked Young to come and pick him and his daughter up for the weekend. Shawn was still at home working in the utility room when Young arrived to pick up appellant. Young proceeded to help appellant get clothes and other items together. Shawn saw Emma when she

---

[6] The trial court sustained appellant's hearsay objection and the content of Emma's question was not admitted into evidence.

8

stood in the door of the utility room looking for her mother. Shawn told Emma that he did not know where her mother was. When asked during appellant's trial if he had noticed anything unusual about Emma that afternoon, Shawn answered that he did not. Shawn did not notice that Emma was acting in an unusual manner or walking funny. He testified that her lip was not busted, he did not notice any bruises, and she did not have a black eye. Shawn also testified that he would have noticed if Emma had had a bloody or bleeding vagina, but she did not have that.

As already mentioned, Christie Frazier was Young's next-door neighbor. On the evening of June 26, 2009, Frazier was working outside in her yard. Young called out a greeting to Frazier. When Frazier looked up, she saw Emma walking behind Young wearing only her panties. Frazier remarked to Young that Emma did not have any clothes on. Young then told Emma to go back into the house and put on some clothes. When Emma turned around to return to the house, Frazier noticed blood on Emma's panties. Frazier asked Young about the blood, and Young responded as if she was already aware of it. Frazier marked a pair of panties where she saw the blood that day on Emma's panties. It did not appear to Frazier that Emma was having any difficulty walking or that there was anything physically wrong with Emma that evening. According to Frazier, Emma did not have a busted lip, a black eye, or any abdominal bruising. Emma did not appear to have a bleeding vagina, she was not complaining, and she did not appear to be in any pain. According to Frazier, appellant had arrived at Young's house earlier in the day, before she had observed the blood on Emma's panties.

Emma's twelve year old sister, L.D., was present at Young's house the entire day of June 27, 2009. L.D. did not see Emma fall and hit her private parts that day or prior to that day. L.D. did remember that Emma had scratched herself in the pool, causing her mother to have to change Emma into regular clothes. According to L.D., if Emma was standing, there would be a lot of blood, but there would not be a lot of blood if Emma was laying down. L.D. never saw Emma slip or hit her private parts on the

9

ladder of the pool in their backyard. L.D. did not see any bleeding coming from Emma's private parts, the only blood she did see was on the back of Emma's underwear and not her private area. L.D. testified that she saw the blood on the back of Emma's underwear on Friday night. According to L.D., appellant spent the night at their house on Friday night. L.D., her sister J.T., and appellant's daughter, all made pallets in front of the television that night. According to L.D., on Friday evening, Emma was not walking weird, complaining about pain in her private part area, did not have a busted lip, and while Emma had bruises on her face from the beginning of June, those were healing.

The next day was Saturday, June 27, 2009, and according to L.D., Young was in and out of the house a great deal that day. L.D. testified that Young left the house at least three times, each time leaving appellant as the only adult present at the house. Young left in the morning to get doughnuts. Young left again in the afternoon to get gas and a small amount of groceries, returning to the house between 1:00 and 3:00 in the afternoon. Young also left the house in the evening to go grocery shopping at Randall's, checking out at 7:30 p.m. and returning home about 8:00 p.m.

While Young was out in the morning buying doughnuts, L.D. heard Emma fall in the kitchen and hit her head. Appellant was also in the kitchen when Emma fell. The fall resulted in a cut on the back of Emma's head that, according to L.D., bled a lot. L.D. testified that appellant helped Emma deal with the bleeding. L.D. testified that, aside from the laceration on her head, Emma still looked normal, and she did not have any bruises on her body. After falling and hitting her head, Emma felt drowsy, but Emma still indicated to L.D. that she was feeling okay. After the bleeding had been taken care of, appellant took Emma to lay down on the living room couch. When Young returned home about thirty minutes later, she suggested that Emma go into Young's downstairs bedroom. Emma then went into the master bedroom and fell asleep.

10

While Emma was napping in her mother's bedroom, L.D., J.T., and appellant's daughter changed into their swimsuits and went outside to swim. Appellant remained inside the house while the girls swam. While she was swimming, L.D. was not aware of what was going on inside the house because the blinds were down. Later that day, after Young had left the house to get gas, L.D. got out of the pool and went inside the house to go to the bathroom. L.D. decided to check on Emma, but when she tried to open her mother's bedroom door, she discovered it was locked. L.D. did not see appellant anywhere else in the house, and he normally never went upstairs. L.D. did not call out for Emma because she was afraid she would wake her up; she did not call out for appellant because she assumed he was in the shower. After she was inside for about five minutes, L.D. went back outside to swim. According to L.D., the girls swam most of the day.

About 8:00 p.m., L.D. saw her mother arrive home with some groceries. L.D. helped her mother bring the groceries into the house and put them away. Once inside the house, L.D. saw that the door to her mother's bedroom was now open a crack. L.D. also saw that appellant was in the living room watching television. L.D. glanced into the bedroom and saw Emma from a distance. L.D. thought Emma was still taking a nap because her eyes were closed.

Young eventually went into the bedroom to check on Emma, first just glancing at her, and then taking a closer look. Young finally came out of the bedroom carrying Emma in her hands. Before Emma had taken her nap, L.D. testified she looked fine, but now L.D. saw she had a swollen lip and a swollen eye. L.D. had not previously seen the swollen lip. Emma was also not speaking as her mother carried her out of the house. Appellant followed behind Young talking with her. According to L.D., appellant came back into the house and started watching television with her. L.D testified that appellant continued watching television with her until he received a telephone call. After the telephone call, appellant called L.D.'s aunt, and then told L.D. to start packing. Before

11

L.D. could finish packing, appellant took all three girls over to Christie Frazier's house. According to L.D., appellant grabbed his daughter, ran out of Frazier's house, and then "he fled to the car and drove off."

On cross-examination, L.D. acknowledged that she told the police that Emma was throwing up during the day. She also acknowledged that Emma was not always a well child, and that she could be clumsy. L.D. agreed that appellant tried to help Emma with her head injury in the kitchen and that Emma never told L.D. about appellant doing anything bad to her. L.D. also remembered that, at one point, her red blanket was on the pallet she had made in front of the television. While L.D. acknowledged that she had never previously told anyone about the master bedroom door being locked, she explained that no one had ever asked her about it so she thought it was not important.

After Young took Emma to the hospital, appellant was outside Young's home with Christie Frazier and another neighbor, Jennifer Villarreal. Villarreal had just driven by what she thought was an accident on her way home, and she saw appellant and Frazier talking at the front porch of Frazier's house. Appellant and Frazier were on their phones, and Villarreal walked over to see what was going on. Villarreal could hear Young on Frazier's phone and she sounded frantic. From the portion of the conversation she could overhear, Villarreal knew they were performing CPR on Emma. To Villarreal, appellant seemed nervous, not upset. Villarreal heard appellant call his mother and tell her: "Mom, Emma's dead. She's gone." When Villarreal asked appellant if he was going to the scene of the accident, he put his hand in the air and said, "I can't be dealing with this, I got to go." When Villarreal asked appellant if Emma had a fever or had thrown up, he said no.

Frazier testified that she was outside on her front porch talking on the telephone with her husband when she saw appellant walking up and down Young's driveway talking on the telephone. Frazier, who had seen Young drive off a short while before, had become aware there was some type of accident blocking access to the neighborhood.

12

Frazier called out to appellant to call Young and tell her there was an accident blocking the neighborhood entrance. Frazier then saw L.D. running down the driveway holding both sides of her head. At that point, appellant approached Frazier and asked her for help. Appellant told Frazier that Young and Emma were involved in the wreck down the road and they were performing CPR on Emma. At that point, L.D. ran up to Frazier. L.D. was talking on the phone with her aunt. Appellant brought the other girls over to Frazier's house. After getting food for all of the children now at her house, Frazier arranged for Villarreal to stay at the house to watch the children. Frazier, appellant, and appellant's daughter then got in Frazier's car. Frazier thought they were going to help Young, but appellant asked her to take him up the road instead. Frazier dropped appellant at a Jack in the Box near their neighborhood where appellant's sister Nicole and her husband met him.

Appellant and his daughter got into the car with Nicole and her husband. Nicole, who was already aware that Emma was dead and knew that Young was alone at the hospital, thought it was strange that appellant left Young alone at the hospital. Nicole asked appellant for information and he indicated that Emma had died because of undetected diabetes. Appellant told Nicole that Emma had not been feeling well all day and she had been lying around on a pallet sleeping as a result. Nicole, who had regularly babysat for Young, had never seen any bruising or similar injuries on L.D., J.T., or Emma.

Both the medical examiner and appellant's medical expert testified that the injuries Emma sustained would have resulted in a lot of bleeding. After Emma's death, Mark McElvany, the crime scene investigator assigned by the Harris County Sheriff's Department to the case, found cleaning supplies, a mop, and Clorox cleaning wipes in the master bathroom of Young's house. According to McElvany the cleaning supplies appeared out of place. While McElvany did find blood evidence spread throughout Young's house, he did not find any large pools of blood. McElvany found an apparent

13

blood stain on the upstairs bathroom door as well as one on the toilet. According to McElvany, there also appeared to be some blood on the upstairs carpet. McElvany also found apparent bloodstains in the master bathroom as well as in the downstairs half-bathroom. All of these apparent bloodstains were swabbed and sent to the lab for testing. The test results revealed that the blood upstairs was consistent with Emma's. In addition the blood drop found downstairs in the master bathroom contained a mixture of both appellant's and Emma's DNA.

McElvany found L.D.'s red blanket in the foyer of the residence, rather than on the pallet in front of the television where she had originally placed it. Christy Smejkal, a DNA analyst for the Harris County Institute for Forensic Science, examined the blanket looking for both semen and blood. Smejkal detected semen on the blanket and a presumptive test for blood was positive. When Smejkal did further testing on the presumptive blood, she was unable to get any further results. Smejkal tested four semen stains from the red blanket and determined appellant was the major contributor to all four. When the non-sperm fraction of the same stains were tested, on one of the stains, only Emma's DNA could not be excluded as a minor contributor. On the remaining stains, appellant, Emma, and Emma's father, Ben Thompson, could not be excluded as minor contributors. According to Smejkal, there was no way to tell from the testing when the DNA was deposited on the red blanket.

A beige flat sheet and pillow case found by McElvany with the red blanket were also examined by Smejkal. Once again Smejkal searched for blood and semen. Smejkal detected blood on the flat sheet but no semen. Smejkal testified the blood was consistent with Emma's DNA. The beige pillowcase tested negative for semen but tested presumptively positive for blood. Upon further testing, Smejkal was unable to determine if the stain was blood. Smejkal also tested a pillow found with the red blanket as presumptively positive for blood and the DNA was consistent with Emma's.

McElvany collected Emma's clothes from Memorial Hermann Woodlands Hospital on the night of her death. He also recovered a pair of panties from a garbage bag inside the garage of Young's house a month later. Emma's blood was found on the underwear she was wearing the night of her death, but no semen was detected. The underwear McElvany recovered a month later also tested negative for blood and semen, despite the existence of a large discolored stain. Smejkal testified that a month in a hot garage would likely degrade any DNA that had been present on the underwear.

McElvany testified that he saw evidence of a cleanup, and was surprised to still find blood throughout Young's house. McElvany took numerous pictures of the scene, though he left many items at the residence rather than collecting them. These items included a mop, a screwdriver found in the master bathroom, and a wadded up piece of toilet paper in the upstairs bathroom that appeared to have blood on it. Appellant's forensic expert, George Schiro, testified that he did not believe McElvany had done an adequate job investigating the scene. Schiro based his opinion on a review of the offense report and the scene photographs. Schiro listed a number of things that he felt McElvany should have collected rather than merely photographed. According to Schiro, he would have collected the mop and was surprised that the trash cans, clothes hampers, and the washer and dryer had gone unchecked by law enforcement. Schiro also indicated that McElvany should have used an alternative light source at the scene to possibly detect additional semen stains. However, on cross-examination, Schiro acknowledged that given the significant injuries Emma suffered, it appeared from the pictures taken by McElvany that the area had been cleaned up. In addition, while Schiro opined that McElvany should have collected the mop for DNA testing, he conceded that someone's DNA on the mop does not establish that was the person who used the mop to clean up the scene. Schiro also agreed that, based upon his years of experience in law

enforcement, the injuries Emma sustained suggested that she had been sexually assaulted and the case should have been investigated as such.[7]

Shawn Walker testified about a conversation he had with appellant sometime after Emma's death, but before appellant was arrested. Appellant told Shawn that he was worried Shawn and his sister Nicole would think he was guilty. Appellant also told Shawn that he thought he was "going to do some time for this one." Shawn reassured appellant that if he was innocent, he would be all right. Appellant responded, "Well, I can tell you this, they won't find any DNA on that little girl."

Dr. Patricia Moore, a former medical examiner with the Southeast Texas Forensic Center, performed the autopsy on Emma. Dr. Moore discovered an abnormal number of bruises on Emma, the majority of which were fresh, though there were some older ones present as well.[8] While not providing an opinion on the exact age of the bruises, Dr. Moore testified that if no one had seen the bruises prior to the afternoon of June 27, that information would be consistent with the injury occurring during the afternoon of June 27. Dr. Moore opined that the injuries to Emma's abdomen were consistent with a grown man leaning on her abdomen and leaving finger-shaped bruises. According to Dr. Moore, the external bruises on Emma's abdomen corresponded to the internal injuries she suffered. Dr. Moore acknowledged that some of the injuries inside Emma's abdomen could have been older than 24 or 36 hours. Dr. Moore measured 375 CCs of free blood in Emma's abdomen, with a focal area of hemorrhage around Emma's liver. Dr. Moore opined that an extreme amount of force and pressure on someone's stomach could cause the amount of bleeding found in Emma's abdomen. In addition, Dr. Moore

---

[7] McElvany testified that, based on the information known to him at the time he went to Young's house, he treated the crime scene as the location of a sexual assault.

[8] For example, Dr. Moore found approximately twenty five bruises on Emma's abdomen.

16

opined that, if no one had seen the bruises on the outside of Emma's body by 11:00 a.m. on June 27, then the internal abdomen injuries could have occurred that afternoon.[9]

Dr. Moore also observed noticeable bruises on Emma's face. As with the other bruises, Dr. Moore explained they would have been seen before June 27 had they occurred before that point in time. Dr. Moore also found significant damage to Emma's upper lip. Dr. Moore testified this injury was a highly visible injury. According to Dr. Moore, there was a laceration on Emma's upper lip and inside of Emma's mouth, a portion of Emma's upper lip was torn and separated away from the upper gum. There were also superficial cuts on the outside of Emma's lower lip. Inside of Emma's lower lip, Dr. Moore found bite marks made from Emma's own teeth. Dr. Moore explained that inserting a breathing tube would not cause that type of injury because the breathing tube is not put in that area. Nancy Harris, one of the persons who had performed mouth-to-mouth resuscitation on Emma at the roadside, did not observe any injuries inside Emma's mouth or taste any blood, though she did observe that Emma's lips appeared dry and cracked as if she was dehydrated. Harris explained that it was dusk when she was performing CPR on Emma and "it was hard to see a lot." Harris, who was trained in administering CPR, observed the bruises on Emma's abdomen, which she stated were not caused by CPR.

Dr. Moore also examined Emma's vagina and the surrounding area. Dr. Moore observed between ten and twelve bruises on Emma's thighs. According to Dr. Moore, it is not normal for a child to have bruises in that area. In addition, she believed the bruises appeared recent and would have been consistent with an injury occurring during the afternoon of June 27 if no one had seen them before then. When Dr. Moore opened Emma's labia, she observed what appeared to be fresh blood and a large tear in her

_____

[9] As detailed below, the State introduced autopsy photographs of Emma's external bruises and injuries in two groups. Appellant lodged separate objections to each group. With the exception of Emma's removed vagina, the State did not offer into evidence any photographs of Emma's internal injuries. Appellant did not object to any testimony regarding either the internal or external injuries.

vagina. Dr. Moore opined that it was not normal for a four-year old girl such as Emma to have a hole in her vagina the size of the hole she found during the autopsy. According to Dr. Moore, this injury would have caused Emma extreme pain and would have affected the way she walked. In addition, Dr. Moore testified Emma's vaginal wound would have bled a great deal. Dr. Moore also testified that the injury was consistent with having occurred on the afternoon of June 27 given that no witnesses had seen Emma acting or walking unusually before that time. Dr. Moore ultimately removed Emma's vagina to get a better look at the injury under the microscope. Dr. Moore saw evidence of older injuries that could have been consistent with Emma scratching herself as well as the healing of lesions associated with genital herpes. Dr. Moore did not believe Emma's vaginal injury was an accidental straddle injury based on her reading of literature on the subject. In Dr. Moore's opinion, Emma's vaginal injury could be consistent with someone inserting or pushing either a male sexual organ or an unknown object into Emma's sexual organ.

Appellant called Dr. Michael Heard, a specialist in pediatric gynecology, to testify. Dr. Heard opined that Emma had suffered an accidental straddle injury based upon the photographs he saw, the medical records he reviewed, and the police reports. Dr. Heard also observed that Emma had an extensive amount of bruising all over her body. Looking at Defendant's Exhibit 5, an autopsy picture of Emma's vagina, Dr. Heard denied that the picture showed fresh blood, explaining instead that it was an abrasion because the medical examiner's fingers were on top of it. Dr. Heard noted a "brush burn" in Defendant's Exhibit 6, a second autopsy photograph showing Emma's vagina, which is consistent with skin brushing against a rough surface, a type of injury he did not associate with sexual assault. Dr. Heard also explained that acute trauma to the perineum in the bottom part of the vagina could cause it to split open. Under his straddle injury scenario, Dr. Heard opined that, for a fall to have caused Emma's vaginal injury, it would have to have occurred from a height of ten to fifteen feet. However, he later testified that a fall onto the ladder to the pool in the back of Young's house would be

18

consistent with Emma's vaginal injuries. Dr. Heard opined that it was common to find semen inside the vagina in a sexual assault case, and the lack of it in Emma's vagina was inconsistent with sexual assault. Dr. Heard explained that semen can last for several days in the vagina and that a man does not have to ejaculate during intercourse to deposit semen in a vagina. Dr. Heard also testified that it was possible for Young to have contracted herpes years before and that she could have then passed it to Emma without ever showing signs of the disease. Finally, Dr. Heard speculated that Emma could have succumbed to a very rare disease known as Behcet's Disease, a disease that results in bruising and skin lesions.

On cross-examination, Dr. Heard agreed that Emma would have been in extreme pain from her vaginal injury and would not have been able to walk normally. Dr. Heard also agreed that Emma's injury would have bled more extensively than what Frazier had observed when Emma walked out of the house wearing only her panties. Dr. Heard acknowledged basing his opinion that Emma's vaginal injury was a straddle injury on the autopsy pictures, Frazier's observation of blood in Emma's panties, and a statement that Emma had injured herself at the pool, even though he had no details about how that pool injury occurred. Ultimately Dr. Heard agreed that the tear in Emma's vagina could have been caused by someone shoving an unknown object into Emma's vagina.

Dr. Singh also looked at the photographs of Emma's vaginal injuries taken after her death. According to Dr. Singh, Emma did not have any vaginal injuries on June 8 when she examined her. In addition, Dr. Singh thought Emma's vaginal injury showed a significant tear that was inconsistent with a straddle injury. Dr. Singh would have considered modes of injury other than a straddle injury, such as sexual abuse or abuse of any kind, if a child came to her with the type of injury Emma experienced. Dr. Singh testified that inserting an object into the genital area would be one way to cause the type of injury Emma had sustained. However, she acknowledged that she was not an expert on such injuries and would defer to the Texas Children's Hospital's diagnosis of Emma.

19

The State also called Dr. Reena Isaac to testify in rebuttal. Dr. Isaac completed a pediatric residency with a subspecialty in child abuse or forensic pediatric care. At the time of her trial testimony, Dr. Isaac was employed as the medical director of the sexual assault nurse examiner's program at Texas Children's Hospital. Dr. Isaac had expertise in all realms and all different forms of child maltreatment, including sexual abuse. The investigator on the case had first contacted her after the autopsy was completed to review the photographs, and she had reviewed them again before her testimony. Looking at the autopsy photographs, Dr. Isaac believed Emma's injuries were consistent with sexual abuse rather than a straddle injury. Dr. Isaac opined that the vaginal injury was caused by a male sexual organ or an unknown object. Though Dr. Isaac allowed for the possibility that there could have been blunt force injuries to the outside of Emma's vaginal area, she explained Emma's injuries were more internal, and typical straddle injuries do not include injury to the hymenal area, but in this case, Emma's hymen was essentially gone. Dr. Isaac also believed the autopsy photographs showed blood in Emma's genital area, explaining that the medical examiner's finger could be on dried blood without the blood coming off on her glove. While Dr. Isaac acknowledged that there were several abrasions in that area, she further explained that male pubic hair can be abrasive if applied with enough force.

## DISCUSSION

### I.    Sufficiency of the Evidence

In his first issue, appellant contends the evidence is insufficient to prove beyond a reasonable doubt that he committed aggravated sexual assault.

#### A.    Standard of Review and Applicable Law

In a sufficiency review, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307,

20

319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality opinion); *Pomier v. State*, 326 S.W.3d 373, 378 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Our review includes both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are treated equally. *Id.* The jury, as the sole judge of the credibility of the witnesses, is free to believe or disbelieve all or part of a witness's testimony. *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses to, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Reconciliation of conflicts in the evidence is within the jury's discretion, and such conflicts alone will not call for reversal if there is enough credible evidence to support a conviction. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). An appellate court may not re-evaluate the weight and credibility of the evidence produced at trial and in so doing substitute its judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); *Harris v. State*, 164 S.W.3d 775, 784 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curry*, 30 S.W.3d at 404. "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the

21

defendant was tried." *Villareal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

A jury may infer knowledge or intent from the acts, conduct, and remarks of the accused, and from the surrounding circumstances. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991), *overruled on other grounds by*, *Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992). Direct evidence of the elements of the offense is not required. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). Juries are permitted to make multiple reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Hooper*, 214 S.W.3d at 14–16. Circumstantial evidence alone can be sufficient to establish guilt. *Id.* at 15.

To establish the offense of aggravated sexual assault of a child under six years of age, the State must prove appellant intentionally or knowingly caused the penetration of the anus or sexual organ of a child by any means and the victim was younger than six years of age at the time the offense was committed. Tex. Penal Code Ann. § 22.021. Penetration of the female sexual organ may be proven circumstantially. *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).

**B. Analysis**

Appellant makes three separate arguments as to why the evidence is insufficient to support his conviction.

**1. Should photographic evidence admitted at trial be ignored in our sufficiency review?**

Appellant begins by arguing that, if the photographic evidence is removed from our analysis, the evidence is insufficient to support his conviction. Appellant's assertion that we should not consider the photographs in our evaluation of the sufficiency of the evidence is incorrect. An appellate court must consider all evidence admitted at trial in

22

its sufficiency review and give it whatever weight and probative value it could rationally convey to a jury. *Moff v. State*, 131 S.W.3d 485, 489 (Tex. Crim. App. 2004). As a result, we reject appellant's request to exclude the photographic evidence.

**2. What weight should the absence of semen be given in our sufficiency review?**

Next, appellant points out the fact that the investigation in this case did not detect the presence of semen on Emma's body or in the clothing she was wearing when she was taken to the hospital, which he contends renders the evidence insufficient. We disagree. The State was not required to prove as an element of the offense that appellant's semen was present on Emma or her clothing. All the State was required to prove was that appellant penetrated Emma's vagina by any means, which could have been an unknown object and not appellant's sexual organ. Each of the medical experts who testified during appellant's trial on this subject agreed Emma's vaginal injury could have been caused by the insertion of an unknown object. Therefore, the absence of semen evidence does not render the evidence insufficient.

**3. Does the existence of conflicting evidence render the evidence supporting appellant's conviction insufficient?**

Finally, appellant argues that the existence of potentially conflicting evidence in the record renders the evidence insufficient to support his conviction. Appellant's argument that the record may contain contradictory evidence is not for our determination. It is the fact finder's role to assess the credibility of witnesses and resolve conflicts in the evidence. *Beckham*, 29 S.W.3d at 151. Contradictions or conflicts between the witnesses' testimony do not destroy the sufficiency of the evidence; rather they relate to the weight of the evidence and the credibility the jury assigns to the witnesses. *Id.* A reviewing court may not substitute its conclusions for that of the jury, nor may it interfere with the jury's resolution of conflicts in the evidence. *Id.* at 152. Instead, we only consider whether the jury reached a rational decision. *Id.* at 151. Accordingly,

23

we reject appellant's request that we reevaluate the evidence and substitute our own conclusions for those of the jury.

## 4. The evidence is sufficient to support appellant's conviction.

The State presented circumstantial evidence to establish that appellant sexually assaulted Emma. This evidence begins with the fact that once appellant became romantically involved with Emma's mother, Emma's health began to deteriorate. Emma began to suffer multiple bruises during a time period when appellant was serving as her babysitter and was home alone with her. The evidence established that appellant was infected with herpes 2, a traditionally sexually transmitted disease, and Emma became infected with the virus after appellant began staying at their home and babysitting Emma. In addition, Emma's mother tested positive for the virus during this time period as well.[10]

The night and morning before her death, Emma had no noticeable bruises or injuries and she was walking normally, observations and behavior inconsistent with the injuries that would mark the end of her life. After cutting her head in the kitchen, Emma indicated to her older sister that, other than being drowsy, she felt okay.

Following her head injury, Emma went to take a nap in her mother's bedroom while the other children in the house went outside to swim. Appellant remained inside the house alone with Emma. Emma's sister L.D. testified that, while she was outside swimming, she could not tell what was happening inside the house because the blinds were down. Also, when L.D. did go inside the house to use the bathroom, she tried to check on Emma but was unable to do so because she found the master bedroom door locked. L.D. also testified that she did not see appellant anywhere in the house at that time. The evidence established that Emma's mother was gone much of the final day of

---

[10] The evidence also established that Emma's father did not have the herpes 2 virus.

24

Emma's life and that appellant was the only adult present in the house with Emma during the time Young was absent.

Emma's mother returned from a trip to the grocery store about 8:00 p.m. After putting the groceries away, Young went to check on Emma in the master bedroom. Young carried Emma out of the bedroom and L.D. saw bruises and a split lip that Emma did not have when she went into the bedroom to take a nap. Young placed Emma in her car and left the house.

Once Emma made it to the hospital, she was quickly pronounced dead. The nurses documenting Emma's injuries noted the presence of lividity, indicating Emma had been dead for some time. They also noticed that Emma was covered in bruises and had a fresh, significant tear to her vagina that extended almost to her rectum. All of the doctors who testified on the subject agreed that Emma's vaginal injury could have been caused by the insertion of an unknown object.[11] In addition, Dr. Moore and Dr. Isaac both testified that Emma's vaginal injury could have been caused by the insertion of a male sexual organ.

The medical evidence established that Emma's vaginal injury would have bled a great deal, yet minimal blood was found inside the house. The evidence also indicated that a clean-up had occurred. With regard to the blood that was found inside the house, some was identified as Emma's and a blood drop found in the master bathroom was found to contain a mixture of both appellant's and Emma's DNA.

In addition, the jury heard Villarreal's testimony that, following Young's departure with Emma, she heard appellant tell his mother on the telephone that Emma was dead. According to Villarreal, this conversation occurred at a time when she believed medical personnel were still performing CPR on Emma. The evidence

---

[11] The doctors who testified regarding the injury to Emma's vagina were: Dr. Singh, Emma's pediatrician; Dr. Moore, the medical examiner who conducted Emma's autopsy; Dr. Heard, appellant's medical expert; and Dr. Isaac, medical director of the SANE program at Texas Children's Hospital.

established that appellant fled the scene soon after this conversation, explaining "I can't be dealing with this, I got to go." Finally, the jury heard Shawn Walker's testimony that appellant told him that he thought he was "going to do some time for this one." The jury also heard Shawn's testimony that, in the same conversation, appellant said: "Well, I can tell you this, they won't find any DNA on that little girl."

Based on the totality of the foregoing evidence, we hold the evidence is sufficient for a rational jury to conclude that appellant sexually assaulted Emma by penetrating her sexual organ with an unknown object or his male sexual organ. We overrule appellant's first issue.

## II. Admissibility of Photographs of External Injuries

In his second issue, appellant contends the trial court erred when it admitted photographs showing Emma's injuries other than those in her vaginal area. According to appellant, the trial court's decision to admit these photographs into evidence violated both Rule 404(b) and Rule 403 of the Texas Rules of Evidence.

### A. What Has Appellant Appealed?

We turn first to the question of exactly which photographs appellant contends on appeal the trial court erroneously admitted. There were two sets of photographs admitted into evidence that detail Emma's injuries. The first group of pictures was taken by Deputy McElvany at the hospital the night of Emma's death. The second set of pictures includes the photographs taken by Dr. Moore during Emma's autopsy. While it is not clear from appellant's briefing exactly which photographs are encompassed by his second issue, we liberally construe his issue as challenging the trial court's decision to admit both Deputy McElvany's hospital photographs and Dr. Moore's autopsy photographs that show any injury other than the injuries to Emma's vagina.

### B. The Autopsy Photographs

The State offered into evidence thirty-eight photographs taken during Emma's autopsy. Each of the autopsy photographs show some part of Emma's nude body. The autopsy photographs were offered in two separate groups. The initial group consisted of State's Exhibits 252 through 255. State's Exhibit 252 is a close-up photograph of Emma's vagina with the labia pulled open a small amount to reveal the injury she suffered. State's Exhibit 253 is a more distant view of Emma's vaginal area that also shows the bruising on Emma's thighs, abdomen, and hips. State's Exhibit 254 is another close-up photograph of Emma's vagina with the labia opened further than in State's Exhibit 252 to show more of Emma's vaginal injury. State's Exhibit 255 is a more distant view showing Emma's vaginal area and the bruising on her inner thighs. Appellant objected, contending the admission of these photographs would violate Rule 403 and Rule 404(b) of the Texas Rules of Evidence. The trial court overruled appellant's objection and admitted the photographs into evidence.

The second group of autopsy photographs consisted of State's Exhibits 277 through 310. Appellant objected to the admission of these photographs based on relevance and Rule 403 of the Texas Rules of Evidence. Once again the trial court overruled appellant's objections and admitted the photographs. State's Exhibits 277 and 278 show most of Emma's nude body on the autopsy table. The photographs show her facial injuries, her distended abdomen, as well as the bruising on her abdomen, hip, and thighs. State's Exhibits 279 through 282 are close-up pictures of the bruising on Emma's abdomen. State's Exhibits 283 through 287 are close-up photographs of the laceration on the back of Emma's head. State's Exhibit 287 shows the laceration after the surrounding hair had been removed. State's Exhibit 288 shows Emma's back injuries as well as the lividity present in her body. State's Exhibits 289 through 291 are close-up photographs of injuries on Emma's back. State's Exhibits 292 and 293 show bruising on Emma's legs. State's Exhibits 294 through 298 show the injuries to the inside of Emma's upper and lower lips. State's Exhibits 299 through 302 show Emma's facial and neck injuries. State's Exhibit 303 shows an injury to Emma's hip area.

27

State's Exhibit 304 is a close-up of Emma's vagina with the labia pulled apart to show the injury. State's Exhibit 305 is a close-up of Emma's vagina with the labia only slightly pulled apart. State's Exhibit 306 is a close-up photograph of Emma's vaginal area that had been removed as part of the autopsy. State's Exhibit 307 shows bruising to Emma's left inner thigh. State's Exhibit 308 is a close-up photograph of Emma's vagina with the labia pulled open to expose the internal tearing she sustained. State's Exhibit 309 is a close-up photograph of Emma's vagina with the labia closed. State's Exhibit 310 is a close-up photograph of Emma's injured right hand.

## 1. Texas Rule of Evidence 404(b)

Evidence of extraneous offenses is not admissible at the guilt phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character. Tex. R. Evid. 404(b); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). Despite the general rule, extraneous offense evidence may be admissible when it has relevance apart from character conformity. *Devoe*, 354 S.W.3d at 469. Whether extraneous offense evidence has relevance apart from character conformity is a question for the trial court. *Id.* Thus, a trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse of discretion standard. *Id.* As long as the trial court's ruling is within the zone of reasonable disagreement, there is no abuse of discretion and the trial court's ruling will be upheld on appeal. *Id.* A trial court's Rule 404(b) ruling is generally within this zone if there is evidence supporting a determination that an extraneous transaction is relevant to a material, non-propensity issue. *Id.*

Evidence of another crime may be admissible as same-transaction contextual evidence where several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof of any one of them cannot be given without showing the others. *Id.* The jury is entitled to know all relevant surrounding circumstances of the charged offense. *Id.* Same-transaction contextual offense evidence illuminates the nature of the crime alleged by imparting to

28

the trier of fact information essential to understanding the context and circumstances of events. *Quincy v. State*, 304 S.W.3d 489, 502 (Tex. App.—Amarillo 2009, no pet.). Same-transaction contextual offense evidence is admissible only to the extent that it is necessary to the jury's understanding of the charged offense. *Devoe*, 354 S.W.3d at 469.

Appellant did not object to State's Exhibits 277 through 310 on the basis of Rule 404(b).[12] As a result, appellant has not preserved that issue for appellate review. *Rothstein v. State*, 267 S.W.3d 366, 373–74 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd).

Turning to State's Exhibits 252 through 255, appellant did lodge a Rule 404(b) objection. However, on appeal he only challenges the admission of those photographs that show injuries to areas other than Emma's vagina. Accordingly, we conclude the only photographs at issue here are State's Exhibits 253 and 255.

Appellant argues that the non-vaginal injuries Emma suffered are separate from, and completely unrelated to, the aggravated sexual assault he committed against her. We disagree. The fact these injuries may have occurred immediately before or after appellant's aggravated sexual assault of Emma is of no moment. *Quincy*, 304 S.W.3d at 497. Courts of this state have routinely construed the phrase "criminal episode" to include the period of time immediately before or after the actual act of sexual assault. *Id.* We conclude the photographs of the horrific injuries Emma endured at the hands of appellant were admissible to show the context in which the charged criminal offense occurred because appellant's assaultive behavior was so connected to the sexual assault that they formed an indivisible criminal transaction. *Id.* at 502. We conclude the trial court's decision admitting State's Exhibits 253 and 255 into evidence falls within the

---

[12] To the extent appellant relies on the motion in limine filed prior to trial, we note that a motion in limine preserves nothing for appellate review. *Griggs v. Sate*, 213 S.W.3d 923, 926 n.1 (Tex. Crim. App. 2007). In addition, the motion in limine is not included in the appellate record.

zone of reasonable disagreement. As a result, we hold the trial court did not abuse its discretion when it overruled appellant's objection and admitted the challenged photographs.

### 2. Texas Rule of Evidence 403

Appellant also contends on appeal that the admission of the autopsy photographs of Emma's non-vaginal injuries violated Rule 403 of the Texas Rules of Evidence.

Evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. Relevant evidence may be excluded by the trial court under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Andrade v. State*, 246 S.W.3d 217, 227 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). In conducting a Rule 403 analysis, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that the presentation of the evidence will consume an inordinate amount of time or repeat evidence already admitted. *Casey v. State*, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007). A trial court's ruling whether to exclude evidence under Rule 403 of the Texas

30

Rules of Evidence is measured by an abuse of discretion standard and will not be reversed if the ruling is within the zone of reasonable disagreement. *Andrade*, 246 S.W.3d at 227.

Autopsy photographs are generally admissible, unless they depict mutilation of the victim caused by the autopsy itself. *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001). The removal of internal body parts to portray the extent of injury to the body part itself is not considered mutilation caused by the autopsy because there is no danger that the jury would mistakenly attribute the removal of body parts to the defendant. *Id.* at 151–52. None of the challenged photographs fall within the category of autopsy photographs depicting mutilation of Emma's body.

### a. Probative Force and Need for the Evidence

We begin with an evaluation of the probative value of the challenged autopsy photographs; that is, the inherent probative force of the evidence coupled with the proponent's need for that item of evidence. *Casey*, 215 S.W.3d at 879. Probative force refers to how strongly the evidence serves to make more or less probable the existence of a fact of consequence to the litigation. *Id.* Here, the State utilized the autopsy photographs of Emma's many injuries to demonstrate the timing of the sexual assault and appellant's opportunity to commit the crime. Both Dr. Moore and Dr. Heard agreed that a child who had sustained the injuries found on Emma's body would not have been acting normally. However, witnesses saw Emma acting normally and did not observe any of the visible injuries on Emma until after she had been left alone with appellant inside Young's house on June 27, 2009.

Appellant asserted Emma's injury was the result of an accident, possibly occurring days before her death. Appellant even presented expert medical testimony to that effect. The extensive bruising and other injuries that Emma suffered, which were shown in the autopsy photographs, served to demonstrate that the injury to her vagina was not the

31

result of an isolated accidental fall.    In addition, the fact that not a single witness saw the extensive bruises and other injuries found across large areas of Emma's body, until the evening of June 27, 2009, helped to disprove appellant's defensive theory that Emma's injuries were the result of an accident that occurred prior to that day.

We conclude that the challenged autopsy photographs were highly probative and the State's need for them was great.    *See Drew v. State*, 76 S.W.3d 436, 453 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

### b.        Rule 403 Counterfactors

We now turn to balancing the probative value of the autopsy photographs against the Rule 403 counterfactors.    *Casey*, 215 S.W.3d 883.

### 1.        Potential to Impress the Jury

We first examine whether the autopsy photographs have the potential to impress the jury in an irrational but indelible way.    *Andrade*, 246 S.W.3d at 228.    Rule 403 does not exclude all prejudicial evidence.    It focuses only on the danger of unfair prejudice.    *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).    Unfair prejudice refers only to the tendency of relevant evidence to tempt the jury into finding guilt on grounds apart from the proof of the offense charged.    *Id.*    The prejudicial effect may be created by the tendency of the evidence to prove some adverse fact not properly in issue or to unfairly excite emotions against the defendant.    Appellant's argument is based on the latter premise.

We conclude the autopsy photographs were not inflammatory as they were essential parts of the State's case against appellant.    In addition, the photographs were addressed in a straightforward manner not designed to influence the jury in an emotional manner.    Finally, the power of the photographs stems from nothing more than the effects of appellant's own criminal conduct and they are no more gruesome than the facts of the offense itself.    *See Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995).

32

Even assuming the autopsy photographs were presented to the jury in color,[13] we hold the images were not of such a horrifying or appalling nature that a juror of ordinary sensitivity would have difficulty rationally deciding the critical issues of the case after viewing the autopsy photographs either individually or collectively. *Fuller v. State*, 829 S.W.2d 191, 206 (Tex. Crim. App. 1992), *overruled on other grounds by Castillo v. State*, 913 S.W.2d 529 (Tex. Crim. App. 1995). We conclude the autopsy photographs did not have a great potential to impress the jury in an irrational way and would not tempt them into finding guilt on improper grounds. *See Gallo v. State*, 239 S.W.3d 757, 763 (Tex. Crim. App. 2007) (noting that the "photographs show no more than the injuries that the victim suffered shortly before her death at a time when [the defendant] was the only adult with her."); *see also Santellan v. State*, 939 S.W.2d 155, 169–70 (Tex. Crim. App. 1997) (holding that admission of evidence of abuse of a corpse did not violate Rule 403 as it was vitally important to proving prosecution's case). This factor does not weigh against the admission of the autopsy photographs.

## 2. Confusion of the Issues

Next, we inquire as to the tendency of the autopsy photographs to confuse or distract the jury from the main issues. *See Casey*, 215 S.W.3d at 880. Here, the autopsy photographs addressed essential parts of the State's case against appellant, specifically, the timing of the offense and appellant's opportunity to commit it. In addition, the autopsy photographs were essential to rebut appellant's defensive theory that Emma's vaginal injury was the result of an accident. This factor does not weigh against admitting the autopsy photographs into evidence.

## 3. Misleading the Jury

---

[13] The appellate record contains only black and white copies of presumably color originals. While we can order the originals if necessary, we conclude that fact is immaterial as we conclude the photographs are not overly gruesome regardless of whether they were black and white or in color.

Third, we examine any tendency of the challenged evidence to be given undue weight by a jury on any basis other than emotional grounds. *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). We have already concluded the autopsy photographs were key evidence in proving the State's case against appellant. Therefore, the mere fact that the autopsy photographs document the results of a particularly horrific crime does not make them overly inflammatory or likely to mislead the jury. *See Santellan*, 939 S.W.2d at 172–73. This factor does not weigh against admission.

### 4. Undue Delay

Finally, we examine the likelihood that the admission of the autopsy photographs consumed an inordinate amount of time or merely repeated evidence already admitted. *Gigliobianco*, 210 S.W.3d at 642. This factor concerns the efficiency of the trial proceeding rather than the threat of an inaccurate decision. *Id.* at 641. The time involved in presenting the autopsy photographs to the jury and discussing them during the trial was minimal when compared to the overall length of the whole trial.[14] We also conclude the evidence was not cumulative of other evidence. *See Etheridge v. State*, 903 S.W.2d 1, 21 (Tex. Crim. App. 1994), *superceded by statute on other grounds as stated in Diaz v. State*, 110 S.W.3d 181, 184 (Tex. App.—San Antonio 2003, pet. ref'd), (finding no abuse of discretion in admitting multiple autopsy photographs showing injuries at different angles, including some close-ups, to demonstrate the overall state of the body and to highlight certain injuries); *see also Bacey v. State*, 990 S.W.2d 319, 326 (Tex. App.—Texarkana 1999, pet. ref'd) (concluding photograph of murder victim showing body in its entirety is not cumulative of other photographs showing specific parts of the body). This factor also does not weigh against admission of the challenged photographs.

---

[14] We note that the autopsy photographs discussed the most during appellant's trial were the photographs of Emma's vaginal injuries, the admission of which appellant has not challenged on appeal.

Having considered all of the Rule 403 factors, we hold the trial court did not abuse its discretion when it denied appellant's Rule 403 challenge and admitted the challenged autopsy photographs.[15]

## C.      Deputy McElvany's Photographs

The State offered, and the trial court admitted into evidence, seventeen photographs of Emma taken by McElvany at the hospital. State's Exhibit 3 shows a distant shot of Emma on a hospital bed covered by a hospital sheet up to her face. State's Exhibit 4 is a closer view from a different angle showing Emma's face with a breathing tube inserted into her mouth. State's Exhibit 5 is a close-up of Emma's face with her eyes open and the breathing tube still present, as well as a gastric tube inserted

---

[15] Two recent cases address the admissibility of photographs taken during autopsies of children. The first case is *Prible v. State*, 175 S.W.3d 724 (Tex. Crim. App. 2005). The second is *Rolle v. State*, No. 14-10-01168-CR, 2012 WL 1137102 (Tex. App.—Houston [14th Dist.] April 5, 2012, pet. filed). While appellant has not cited either in support of his Rule 403 argument, we briefly address them to point out that while both involve Rule 403 challenges to the admissibility of photographs taken during autopsies of children, they are both factually distinguishable from the present case.

In *Prible*, the Court of Criminal Appeals determined that the trial court abused its discretion when it overruled the defendant's Rule 403 objection to the admission of autopsy photographs that showed the various internal organs removed during the autopsies of children killed when the defendant set fire to their murdered mother. *Proble*, 175 S.W.3d at 736. The Court of Criminal Appeals went on to hold the error was harmless. *Id.* at 737. The Court of Criminal Appeals' decision that the admission of the children's autopsy photographs violated Rule 403 does not control here for several reasons. First, the cause of the children's deaths in *Prible* was not disputed at trial. Here, as discussed above, appellant disputed the cause of Emma's many injuries, arguing they were accidental. Therefore, the admission of Emma's autopsy photographs was necessary to disprove appellant's defensive theory. Second, the defendant in *Prible* was not charged with the murder of the children while appellant was on trial for the aggravated sexual assault of Emma, the subject of the disputed autopsy photographs. *Id.* Third, unlike in the present case where the autopsy photographs were vital to the State's case against appellant, in *Prible*, the prosecution did not need the autopsy photographs of the children's dissected organs to prove its case against the defendant. *Id.*

The recent majority opinion in *Rolle* is similarly distinguishable. *See Rolle*, 2012 WL 1137102. In *Rolle*, the majority determined that the trial court abused its discretion when it admitted an autopsy photograph of the murdered mother's unborn child over the defendant's Rule 403 objection. *Id.* at *5. The majority went on to decide that the error was harmless. *Id.* at *10. Unlike in the case at bar where appellant was charged with the aggravated sexual assault of Emma, the defendant in *Rolle* was not charged with the murder of the complainant's unborn child. *Id.* at *3. This difference alone makes *Rolle* distinguishable because Emma's autopsy photographs were vital to establishing the State's case against appellant.

into her nose.   State's Exhibit 6 is another close-up view of Emma's face which shows the bruising on her face and a busted lip.   State's Exhibit 7 is a close-up of the super glued laceration on Emma's head.   The remainder of McElvany's photographs show some part of Emma's nude body.   State's Exhibit 8 is a close-up of Emma's upper back with an abrasion as well as blood visible in her hair.   State's Exhibit 9 is a picture of Emma being held on her side showing injuries on her back.   State's Exhibit 10 is a frontal photograph of Emma's abdomen, chest, and face showing bruises on her abdomen and chin area as well as the amount her abdomen was distended.   State's Exhibit 11 is a similar picture from a different angle.   State's Exhibit 12 is a side view of the front of Emma's body from the knees up to her chin area with her legs spread to reveal her vaginal area.   The photograph shows bruising on Emma's abdomen as well as how much her abdomen was distended as a result of internal bleeding.   State's Exhibit 13 is a side view of Emma's bandaged right leg where EMS personnel inserted an interosseous device as a substitute for an IV tube.   Emma's vaginal area is visible as well as bruising on her inner thighs.   State's Exhibits 14, 15, and 16 are different views of Emma's lower right leg with an identification tag around her ankle.   State's Exhibit 17 is a front view of Emma's body with her legs spread.   Emma's vaginal area is visible as are bruises on her thighs and abdomen.   State's Exhibit 18 is a closer view of Emma's vagina and left leg again showing bruising on Emma's inner thighs.   Finally, State's Exhibit 20 is a second close-up view of Emma's vagina and thighs.   This photograph again shows the bruising to Emma's inner thighs as well as a partial tear to Emma's vagina.   The photograph shows Emma's vaginal opening to be abnormally large.   Appellant objected that McElvany's photographs should not be admitted because they were not relevant. The trial court overruled appellant's objection and admitted the photographs.

On appeal, appellant contends the trial court's decision to admit the photographs into evidence violated both Rule 404(b) and Rule 403 of the Texas Rules of Evidence. A complaint on appeal must correspond with the objection made at trial. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *Rothstein*, 267 S.W.3d at 373–74.

An objection stating one legal theory may not be used to support a different legal theory on appeal. *Rothstein*, 267 S.W.3d at 373. Because appellant's argument on appeal does not comport with the objection he lodged in the trial court, we conclude appellant failed to preserve error on the admission of Deputy McElvany's photographs.[16] *Id.* at 373–74.

Having addressed and rejected both arguments raised by appellant, we overrule appellant's second issue on appeal.

### III. Trial Court's Failure to Rule on Impeachment Evidence

In his third issue, appellant contends the trial court erred when it allegedly failed to issue a ruling on the admissibility of impeachment evidence pertaining to Dr. Moore, the medical examiner who conducted Emma's autopsy. The State responds appellant failed to preserve this issue for appellate review. We agree.

During appellant's cross-examination of Dr. Moore, appellant began to question Dr. Moore about her service at the Harris County Medical Examiner's office. The State asked for a bench conference and during that conference, appellant informed the trial court that he intended to impeach Dr. Moore pursuant to Rule 611 of the Texas Rules of Evidence. After excusing the jury, the trial court invited appellant to make a proffer of his intended impeachment. In response, appellant stated he intended to impeach Dr. Moore regarding her job evaluations while serving with the Harris County Medical Examiner's office. Among the subjects listed by appellant were Dr. Moore's alleged failure to follow office policies, failure to understand the objective of neutral medical/legal investigation, and her performance in certain pediatric cases where Dr.

---

[16] We once again note that, to the extent appellant may be relying on his pretrial motion in limine, it preserves nothing for appellate review. *Griggs*, 213 S.W.3d at 926 n.1.

Moore's homicide finding was later allegedly reversed.   The trial court then recessed the trial for a lunch break to consider the case law submitted by the parties on the subject.

When testimony resumed following the lunch break, appellant's trial counsel did not secure a ruling on the impeachment issue and instead continued his cross-examination of Dr. Moore.   Eventually, the cross-examination returned to the subject of Dr. Moore's evaluations:

> [DEFENSE COUNSEL]:   And do you recall your supervisor at the time, Dr. Carter, telling you that — and it's listed under a major weakness — that you had a failure to follow directives, head strong, and not understanding objectives of neutral medical/legal investigation?   Do you remember that?
>
> [Dr. Moore]:                 I partly remember that, yes.
>
> [DEFENSE COUNSEL]:   Approach the witness, judge?
>
> THE COURT:                 Yes.
>
> [DEFENSE COUNSEL]:   If I show you a copy of the document, will it refresh your memory?
>
> [Dr. Moore]:                 Yes, sir.
>
> [PROSECUTOR]:           Your honor, may we approach the Bench?
>
> THE COURT:                 You can make your objection.
>
> [PROSECUTOR]:           Object only to the last portion.
>
> THE COURT:                 That's sustained.
>
> [PROSECUTOR]:           Ask the jury disregard.
>
> THE COURT:                 The jury will disregard the last question and not consider it for any purpose.
>
> [THE PROSECUTOR]:     And admonish counsel about our previous agreement on what —

| | |
|---|---|
| THE COURT: | You know what you're entitled to ask, what you're not. |
| [DEFENSE COUNSEL]: | I thought I did it right. |
| THE COURT: | No. |
| [DEFENSE COUNSEL]: | I apologize. |
| [Dr. Moore]: | Right here? |
| [DEFENSE COUNSEL]: | Yes, ma'am. |
| [Dr. Moore]: | Yes, sir. I see that. |
| [DEFENSE COUNSEL]: | Did at any time your supervisor indicate that they felt you were not neutral in your opinions on your autopsies; meaning you were State biased? |
| [Dr. Moore]: | Yes. She said that there. |
| [DEFENSE COUNSEL]: | Pass the witness. |

To preserve error on a trial judge's failure to rule, an appellant must lodge an objection on the record and receive an adverse ruling. Tex. R. App. P. 33.1(a)(2)(B); *McBride v. State*, 359 S.W.3d 683, 689 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Failure to preserve the error at trial forfeits the later assertion of that alleged error on appeal. *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008).

Although appellant complains that the trial court erred by not issuing a ruling on the admissibility of the impeachment evidence pertaining to Dr. Moore, he fails to point out where in the record (1) he asked the trial court to rule on this issue, (2) the trial court refused to rule on that request and (3) he subsequently lodged an objection to that failure to rule. As a result, appellant failed to preserve this issue for appellate review. *Id.* We overrule appellant's third issue on appeal.

## IV. The In-Court Identification of Appellant's Co-Defendant, Abigail Young

In his fourth issue, appellant asserts the trial court erred when it allowed the State to bring Young into the courtroom wearing jail clothes so that she could be identified by the testifying witness, Dr. DeScioli. When the State brought Young into the courtroom, appellant objected that an in-court identification of Young was not relevant. The trial court overruled appellant's objection.

On appeal, appellant makes two arguments in support of this issue. First, he contends the identification of Young was not relevant. Second, appellant argues the identification violated Rule 403 because the probative value of the evidence was outweighed by the prejudicial effect.

A.    Relevance

As a general rule, evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. Evidence that is not relevant is not admissible. Tex. R. Evid. 402. Questions of relevancy should be left largely to the trial court, relying on its own observations and experience and the conviction will not be reversed absent an abuse of discretion. *Prince v. State*, 192 S.W.3d 49, 54 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

Young was a key character in the events leading up to and following appellant's sexual assault of Emma. Therefore, we conclude her identification was relevant and admissible. *See Garcia v. State*, 919 S.W.2d 370, 402 (Tex. Crim. App. 1994) (holding the in-court identification of the appellant's co-defendant, who was dressed in jail clothes, wearing shackles, and escorted by two deputy sheriffs when he entered the courtroom, was relevant and admissible because he was present when the appellant was arrested).

40

## B.   Rule of Evidence 403

Appellant also asserts the trial court's allowance of the in-court identification of Young violated Rule 403 of the Texas Rules of Evidence.   The State responds that appellant failed to preserve this issue for appellate review.    We agree with the State.

When the State brought Young into the courtroom, appellant lodged only a relevance objection.   Appellant did not object to the in-court identification based on Rule 403.   An objection stating one legal theory may not be used to support a different legal theory on appeal.   *Rothstein*, 267 S.W.3d at 373.   Because appellant's argument on appeal does not comport with the objection he lodged in the trial court, we conclude appellant failed to preserve error on this part of his fourth issue.   *Id.* at 373–74.

We overrule appellant's fourth issue on appeal.

### CONCLUSION

Having overruled each of appellant's issues on appeal, we affirm the trial court's judgment.

/s/     Leslie Brock Yates
Senior Justice


Panel consists of Justices Seymore, Boyce, and Senior Justice Yates.[17]

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

[17] Senior Justice Leslie Brock Yates sitting by assignment.

41